Wells *vs.* The Mayor and Council of Atlanta *et al.*

---

L. C. WELLS *et al.*, plaintiffs in error *vs.* THE MAYOR AND COUNCIL OF ATLANTA *et al.*, defendants in error.

| 43 | 67 |
|----|----|
| 96 | 317 |
| 43 | 67 |
| 106 | 709 |
| 43 | 67 |
| a111 | 791 |
| 43 | 67 |
| 112 | 784 |
| 43 | 67 |
| 113 | 7 |

1. The power to contract for the construction of water-works for the city of Atlanta was, by the original charter of the city, and by the Act of September 22, 1870, conferred upon the Mayor and Council of the city, and no portion of the powers over the construction and management of such works passed out or away from the Mayor and Council under said Act of September 22, 1870, until the Water Commissioners provided for by that Act, as the successors in this respect of the Mayor and Council, were not only elected, but qualified and ready to succeed.

2. When a municipal corporation is, by its proper officers, acting within the scope of its powers, a Court of equity will not, at the instance of the tax-payers of the corporation, interfere to restrain or control its action, on the ground that the same is unwise or extravagant.    To sustain such interference, it must appear, either that the act is *ultra vires* or fraudulent and corrupt.

3. Affidavits used on a motion as to injunction should be copied into the bill of exceptions.    (R.    See end of Report.)

(LOCHRANE, Chief Justice, having been of counsel below did not preside in this case.)

Corporations. *Ultra Vires.* Construction of Acts. Practice of Supreme Court. Before Judge HOPKINS. Fulton county. Chambers. December, 1870.

Wells and others averred in their bill that on the 23d of September, 1870, the General Assembly passed " an Act to authorize the Mayor and Council of the city of Atlanta to provide for the introduction of water-works in said city and for other purposes" and set out parts of said Act, by which it appeared that a debt could be created and that taxation was permitted to raise funds for its payment, etc.; that it provided for the election of a board of Water Commissioners, with power to make such contract, providing for their election at the next election for Mayor and Councilmen for Atlanta, and that the Mayor and Council then in being should exercise such powers only until such election. Further they averred that certain persons therein named, were, on the 7th of December, 1870, (which was the regular day for the election of Mayor and Councilmen for Atlanta,) duly elected Water Commissioners; that at the next meeting of the Mayor and Council thereafter they accepted the bid of Woodruff & Company and Stidham & Company, of Pennsylvania, to erect water-works for Atlanta, at the price of $436,000 00, and exhibited a copy of the resolution by which said bid was accepted.

As citizens of Atlanta and tax-payers on property therein, they said the Mayor and Council had no right to act in said matter *after said election* of Water Commissioners, though the Water Commissioners had not been (nor yet were) organized and qualified as provided by law, and have not considered the question of water-works in their official capacity. Further, they said that said acceptance was made at two o'clock at night, because of haste to complete the contract; that the spirit of the Act was not to precipitate such a burden of taxation upon them, but that the Water Commissioners, as trustees for the citizens, should patiently investigate

and then act in the premises. They charged that the contract had been let at too high a price, they being informed by persons skilled in the business, and believing, that less than half of that sum is as much as said work is worth. Besides, they averred that the benefits of said water-works could not be fully realized until a system of sewerage is constructed, and that that will cost half as much as the entire work, and the city, in their opinion, is unable to pay so much; that by the Act no more than $500,000 00 in city bonds can be expended, which at seventy cents in the dollar makes $350,000 00; that this sum will have to be paid for the mere erection of the works, and defeat the chief purpose of the work. Besides, at such rate, to pay $436,000 00 will force the issue of more bonds than can be issued under said Act. They denominated said acceptance by the Mayor and Council "remarkable action," done in "haste," and an "egregious error," "whether made through fraud, accident, or mistake," they did not know, but said "it is certainly one of these;" and they charged that said bidders, whose bid was accepted, "are actuated by fraudulent designs in seeking said contract, and by this wily scheme, by the aid of many confederates and coadjutors have overreached the said Mayor and Council." They understood, they said, that the contract had not yet been signed by the Mayor, and waiving discovery, they prayed an injunction restraining the Mayor and Council from exercising the power to erect water-works, from issuing any bonds or obligations to said bidders, or any one for them, or taking any further steps in the premises, and restraining said bidders from further proceeding to complete said contract or to operate thereunder, and from claiming any rights under the same, and for general relief.

The Chancellor simply ordered the defendants to shew cause why the injunction prayed for should not be granted. The defendants answered the bill. The bidders simply submitted to the Chancellor the question of power in the Mayor and Council of Atlanta to act in the premises, denied all

fraud and combination, and referring to the bid and specifications exhibited, said the price was not unreasonable, but only a moderate compensation for the work.

The Mayor and Council of Atlanta admitted the passage of said Act, and the right of complainants to sue in the capacity of citizens and tax-payers. It admitted that it was reported that persons (two of them being two of these complainants) ran for, and that the persons named in the bill as such were elected to the office of Water Commissioners, at the said regular election of Mayor and Council for 1871, to-wit: on the 7th of December, 1871, but said they had no official information of the fact; that these commissioners had not, (nor did it appear that they would,) qualify and act, and submitted that under said Act they could not act till the inauguration of the Mayor and Council of 1871. They contended that under the charter of Atlanta, independent of said Act, they had the right to make such contract, that the Act did not take away that power, or if it did, it left them to exercise the powers by said Act given to Water Commissioners till Water Commissioners were duly organized. They gave then a history of their connection with this business, substantially as follows:

On the ...... day of ........., 1870, they appointed three members of the board as a committee to investigate and report as to water-works. One of this committee was Mr. Murphy, a skilled mechanic. By actual survey of various localities, by correspondence and by Murphy visiting various Northern and Western cities and studying their water-works, the committee became prepared to report and on the 30th of September, 1870, did report. A copy of that report is made part of the answer by exhibit. It stated substantially as follows: The committee considered Peachtree Creek, South river and the Chattahoochee river the only points from which a supply of water could be had. The two former would supply three million of gallons of water in every twenty-four hours, and the latter would supply an unlimited quan-

tity.   The elevation at those points, the approximate cost of supplying three millions of gallons per day from either of the two former, and five millions of gallons from the Chattahoochee, with the distance of each from the centre of city was as follows, for sixty thousand population:

| ELEVATION. | DISTANCE. | COST. |
|---|---|---|
| Peachtree..........336 | 5 miles. | $490,000 00 |
| Chattahoochee.....387 | 7 miles. | 750,000 00 |
| South River.......275 | 5 miles. | 380,000 00 |

This expense might be decreased by taking less pipe for distribution, using smaller machinery, etc.   The water of Peachtree Creek is too impure for drinking.   The Cornish system had long been tried, and was certainly good, the Holly system, etc., presented many advantages, but was not so certain as to results.   Throughout it furnished the *data* upon which they came to these conclusions, and concluded with an exhibit of the great advantages from water-works, the probability of the consumption paying the tax on cost, etc.   The answer averred that five hundred copies of this report were published in pamphlet form for distribution, and that it was also published in one or more of the city papers, that the citizens and the press discussed the whole subject, and there was an universal wish for water, and no difficulty but its cost.   Further, the Mayor and Council on the 4th of November, 1870, ordered proposals for sealed bids to be made and put in by the 25th of that month, with specifications and guarantee of plan and performance of the works, and for " machinery in duplicate capable of raising three millions of gallons of water two hundred and seventy-five feet, or five million gallons three hundred and eighty-seven feet, in twenty-four hours, thirteen or seventeen miles of pipe from four to twenty-four, with one hundred and thirty or more fire hydrants," and the Mayor and Council had the right to accept any or reject all bids.

This proposal included only South river and Chattahoo-

chee river, for the reasons aforesaid. This publication was made on the 5th of November, 1870. On the 25th the only bids presented (except some separate bids for parts of the work) were Woodruff's, Stidham & Company's for $843,850 00, Ware & Yardley's, for $704,221 88 for said supply from the Chattahoochee, and the bids for South river, shewn in the Mayor's call for an election hereinafter stated. Such were the facts at the meeting of the board on Friday night before the election for Mayor and Council, for 1871, and the bidders were here upon expenses, waiting for the result. On that night the Mayor and Council determined to submit the matter to the voters of the city. So, on the 4th of December, 1870, the Mayor published a request that the voters at the municipal election should vote for or against water-works, and stated in his publication that the bids for bringing water from South river were $481,500 00, $435,440 00, $345,-837 00 and $338,000 00, and that the bids for the Chattahoochee river were "a great deal more."

Indeed, the Mayor and Council had determined that it cost too much to bring the water from the Chattahoochee. At said election over nineteen hundred votes were polled for water-works, and but four hundred and thirty-eight against them.

When this vote was officially reported to them at their next meeting after said election, they proceeded to examine said bids and specifications, and passed the resolution accepting the bid of Woodruff & Company and Stidham & Company, as stated in said bill. This was done late at night because the specifications were lengthy and it took much time, and they wished to finish the matter at that meeting to let the bidders go home. They attached, as an exhibit to their answer the specifications and bid of Woodruff & Company, and Stidham & Company, and called attention to the fact that they had adopted the Cornish system, with the understanding expressed in their said resolution that they could "reduce the amount of pipes therein contained to such an

amount as they may deem sufficient," that the specifications showed what was to be allowed for such reduction, that the estimate was for a supply for seventy-five thousand inhabitants, and that the chairman of the committee, Mr. Murphy, thought that the contemplated reduction would lessen the bid by $100,000 00. They stated that said Act limited the *permanent* indebtedness for which bonds would issue at $500,000 00, and said they had no intention of going beyond that sum, and that, if they did, the excess would be void. They did not deny that they intended issuing bonds to pay for the work, and pay them out at seventy cents in the dollar. The contractors were to give good security to perform the work according to specifications, etc. They contended that there was no fraud charged in the bill, but stated that they had acted cautiously, after full investigation, honestly as citizens and tax-payers, under oath, and were as little likely to have made mistakes or to have acted corruptly as were complainants.

Upon the coming in of these answers said defendants contended that there was no equity in said bill or if there was that it was sworn off by the answers. Before, but at the hearing, complainant's solicitors read in evidence an affidavit of John G. Westmoreland. This paper was addressed to six private citizens of Atlanta, two of whom were of these complainants, and to the committee on wells, pumps and cisterns of the City Council, referred to certain proposals to furnish water at an elevation of from two hundred and seventy-five to three hundred and seventy-five feet, stated that these proposals contemplated the use of the Holly system, which, at that elevation, was an uncertain experiment, more expensive than others in operation, and perhaps equally so in construction; that he was a member of "the Atlanta Canal and Water Company," chartered in 1870. It stated that in June then last past, said company had offered to furnish one million four hundred and forty thousand gallons of pure water per day, at the sole charges of the company or

jointly with the city, and not charge extortionate prices for the water, at an approximate cost of $93,471 00, bringing it to the centre of the city and in five main streets for a quarter of a mile, at an elevation of sixty feet above the railroad level at said centre. This showed a specification of pipes, etc., and stated that, say $40,000 00 more should be added for contingent expenses, etc., or two million one hundred and sixty thousand gallons could be furnished at $156,000 00 to $175,000 00, or three million gallons at $176,000 00 to $200,000 00; to which add, say $20,000 00 for reservoir and pumps. To this was appended a table showing the number of gallons of water per day under said bids supplied to each inhabitant, estimating the inhabitants at from thirty thousand up to sixty thousand persons.

To this was attached extracts from letters received by his company. From them it appeared that the superintendent of water-works at Lynchburg, Virginia, had written that certain figures in their letter of 30th July were correct. Another party from Lynchburgh wrote that his projected work would cost much nearer $150,000 00 than $89,000 00. And to this paper was attached said affidavit, averring that the figures for one million four hundred and forty thousand gallons from Utoy Creek were derived "from data of scientific hydraulic works and actual measurement of amount of water, etc., and that said quoted replies to letters were as to the figures $89,000 00 or $93,000 00, and that propositions of above estimates were presented to the Mayor and Council "before action was taken by that body in accepting propositions for water-works."

In reply, defendants submitted the affidavit of said Murphy, chairman of water-works committee, who stated that this bid of Westmoreland's was presented in June, 1870, and rejected; that the City Council did not wish water-works under private control, and were not satisfied that said bid was sufficiently considered, and feared that it would prove a disastrous experiment. Further, it stated that the plan pro-

posed by Westmoreland would be of no benefit to the city, and that the committee of citizens also rejected this bid, and Westmoreland did not bid after proposals for bids were published.

After argument the Chancellor refused the injunction, and that is assigned as error.

NOTE—(The bill of exceptions recited that affidavits of Westmoreland and Murphy were read, but did not contain the affidavits or otherwise identify them. In argument, counsel for defendants in error said they could have dismissed the bill of exceptions upon that ground, but wished an opinion on the question, and waived the defect. In reply, counsel for plaintiff in error said it was not a defect. McCAY, Judge, replied, this Court has dismissed cases on said ground.)

MYNATT & DELL, COLLIER & HOYT, for plaintiffs in error. Said Act of 25th September, 1870, took from the Mayor and Council power to make said contract, if they had it before: Sedg. Con. & Stat. L., 39, 136, 248, citing 7 Conn. R., 457, 469; 12 Mass. R., 545; 5 Pick. R., 169; 11 Rept., 59; Smith Stat. & Con. L., 580. The Mayor and Council are trustees, and as such amenable to the Courts: 15 Barb. N. Y. R., 211; 3 Hill R., 531; 4 M. & C., 249: 16 Barb. N. Y. R., 394, 400; 19 Ga. R., Semmes *vs.* M. & C. of Columbus, and M. & C. *vs.* Jacques; 30 Ga. R., 506; 5 Sel., 263; 13 Barb. N. Y. R., 567; Abbott's Dig. L. of Corp. 535; and said the record showed that the contract was fraudulent because too great a price was agreed upon.

A. W. HAMMOND & SON, for defendants, replied that no fraud was charged in the bill: 38 Ga. R., 135; 39th, 572. As to power to make the contract: 1 Wallace S. C. R., 385, 220; 3d, 654; 19 Ga. R., 486; 28th, 50; Charter of Atlanta, sections 13, 27, 76. Glenn's Code. And the Act of 1870 did not take away such power until Water Commis-

sioners were qualified to act: 11 Peter's S. C. R., 420; 8th, Howard S. C. R., 569; 19 Ga. R., 486. Is it not unconstitutional to authorize Water Commissioners to contract? etc.: Conley's Digest, page 24. In absence of fraud even bad bargain binding: 19 Ga. R., 486. *Ultra vires* must be shewn by complainants. Westmoreland is member of Atlanta Canal & Water Works Company, whose charter created monopoly. See Acts 1869, page 107.

McCay, Judge.

1. That the municipal corporation known as the city of Atlanta had authority, under its charter, even before the Act of 1870 was passed, to provide for the introduction of water in the city, and therefore to make contracts for the purpose, seems very clear. This Court has, in effect, so held in the case of *Mayor and Council of Rome vs. Cabut,* 28 Georgia Reports, 50. The real point in dispute is, which of the city's agents, the Mayor and Council or the Water Board, was, by law, clothed with the right to exercise this chartered power of the corporation in December, 1870? Before the passage of the Act of September, 1870, whatever power over the subject existed was undoubtedly in the Mayor and Council, since that body was the general executor of the powers of the corporation. The Act of September, 1870, giving *additional* powers to the city over the subject of water-works, expressly says that until the regular election for the Water Board, the powers granted by the Act may be exercised by the Mayor and Council. See section 22 of the Act. The state of the case at last is this: The right, the franchise, the power to erect water-works, is in the city until the regular election for the Water Board. *Every act* connected with the exercise of the franchise, was to be done by the Mayor and Council, or by their authority. After that election, after the Water Board came into existence, many of the powers and duties of the Mayor and Council went over to the Water Board. That board became the successors in office of the Mayor and Council in

these respects—the new agents, by and through whom the corporation exercised the chartered rights granted to it by the charter. The right is now and has ever been in the city. The Mayor and Council and the Water Board are the mere agents by which the city exercises its powers.

At what point of time, then, does the power of the new agents begin? On the day of the election? On the day after? Or when, according to the charter, they are sworn into office, and enter upon the discharge of their official duties? It seems to us very clear that their powers do not begin until they are "qualified." Such is the usual practice of the State as to other offices. It is very common to hold the election several months before the time provided by law for the person elect to enter upon his duties. In this State, it is the settled rule that the old officer continues to perform the duties of the office until the successor is qualified. This is the provision of the Constitution as to the office of Governor, and as to all other offices. The Code, section 123, makes the same provision. It cannot be known until the new officer is "qualified" that he will ever enter upon his duties, and until then all the duties of the office, of every kind devolve upon the incumbent.

The duties of this Water Board are duties coming to them as the successors of the Mayor and Council, and the Mayor and Council may and must perform all the duties cast upon them by law, until their successors are, not only elected, but qualified. As we have said, the right, the franchise, is in the city, in the corporation. The Mayor and Council or the Water Board are but city agents. The Act expressly directs that the Mayor and Council shall exercise all the powers granted by the Act until the election of the board. We do not think it was intended there should be an *hiatus* in the powers granted in the charter, that from the day of the election until the time when, under the charter, the board was to qualify, the power of the city over the question of waterworks was to be in abeyance.

It seems to us clear, that nothing was intended by the Act of 1870 but to confer new powers upon *the city*, and to clothe the Mayor and Council with authority to exercise it until the Water Board entered upon the discharge of its duties. Until that time the whole power over the matter was in the Mayor and Council; they might contract for, erect and manage the water-works just as the Water Board might do afterwards. Indeed, as to the contract, the initiatory step, there would seem to have been no other motive in clothing the Mayor and Council with all the powers of the Water Board until the election, than to authorize it to make the contract.

The Mayor and Council is the general representative of the people. Ordinarily the whole powers of the corporation are exercised by it, and there was propriety in putting this, the first step, in their hands. The Water Board is, as the whole Act of 1870 shows, a mere subordinate agency intended rather to relieve the Mayor and Council than to rival it; and even after the board is elected and qualified, it will be far more in harmony with the scope of the charter, and not at all in violation of the Act of 1870, for the board to act in harmony with and in deference to the Mayor and Council. Upon the whole, we think the Mayor and Council had power to make this contract.

2. We see nothing in the loose charges made of fraud and corruption. They are entirely too vague to justify any serious consideration by a Court. Whether the contract be a wise one or not, whether the city needs water-works, and what plan is most in harmony with the city wants and with economy, are matters exclusively within the cognizance of the body clothed by the charter with the exercise of the powers of the city. It would be an improper interference by the Courts with the rights of the city, for them to undertake to judge of the expediency of this contract. If its provisions were so shockingly outrageous as to furnish a strong presumption of fraud, that might be an element for consideration, but it would only be proper as a proof of fraud, in

connection with other proofs for the Courts to inquire at all into the propriety of the contract.

Judgment affirmed.