MERCANTILE TRUST & DEPOSIT CO. OF BALTIMORE v. CITY OF COLUMBUS et al.

CITY OF COLUMBUS v. MERCANTILE TRUST & DEPOSIT CO. OF BALTIMORE et al.

(Circuit Court, N. D. Georgia, W. D.    April 25, 1908.)

No. 59.

1. MUNICIPAL CORPORATIONS—CONTRACTS—WATER SUPPLY—POWER OF CITY.
    Cities in Georgia, under the "general welfare" clause in their charters. have power to contract for water supply for their inhabitants and for fire protection.
    [Ed. Note.—For cases in point, see Cent. Dig. vol. 36, Municipal Corporations, § 726.]

2. SAME—CREATION OF DEBT.
    Where a city having power to contract for water supply granted a franchise to a water company to use its streets, and made a contract for a supply of water for a term of years, obligating itself to pay the water company a certain sum annually for the use of water for fire purposes, such contract did not create a debt in violation of the state Constitution.

3. CONTRACTS—CONSTRUCTION—WHAT LAW GOVERNS.
    A contract will be construed according to the law of the state as interpreted by its courts at the time the contract was made, and not in accordance with subsequent contrary decisions.

4. MUNICIPAL CORPORATIONS—CONTRACT FOR WATER SUPPLY—EXCLUSIVE FRANCHISE—VIOLATION—COMPETITION BY A CITY.
    Where a city had power to contract with a water company for water supply for a term of years, it was no objection to such contract that it provided that the water company should have an exclusive franchise,

which provision precluded the city from entering into competition with the waterworks company by the erection of works of its own.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 36, Municipal Corporations, § 757.]

5. WATERS AND WATER COURSES—PUBLIC WATER SUPPLY—CONTRACT—PERFORMANCE—EVIDENCE.

Evidence *held* to sustain the findings of a master that a water company had failed to comply with a contract with the city to furnish its inhabitants with sufficient and wholesome water, etc.

6. SAME—FORFEITURE—INJUNCTION.

A city granted a water company an exclusive franchise to use its streets to furnish water to the city and its inhabitants for a term of years. The service being unsatisfactory, steps were taken by the city to construct and operate an opposition plant, when the bondholders of the original corporation, which was in the hands of a receiver, sued to restrain the city's operation, whereupon the city filed a cross-bill for a decree annulling the contract and restraining complainants from setting up any right or interest thereunder. *Held*, that the city, not being entitled to enter into competition with the water company under its exclusive franchise, was only entitled to a denial of the injunction prayed by complainants in order to provide the city with adequate water facilities on electing to purchase so much of the existing system as was available for use by the city at its fair value.

In Equity.

L. F. Garrard, Hall & Wimberly, and Joseph Packard, for complainant Mercantile Trust & Deposit Co. of Baltimore.

T. T. Miller, J. H. Martin, and Ellis, Wimbish & Ellis, for defendants city of Columbus et al.

NEWMAN, District Judge. This is a bill filed by the Mercantile Trust & Deposit Company of Baltimore, trustee for certain bondholders of the Columbus Waterworks Company, against the city of Columbus, seeking to enjoin the city from selling bonds to build waterworks of its own. There is a cross-bill, in which the city of Columbus seeks to have the contract between it and the Columbus Waterworks Company annulled, on the ground of failure on the part of the waterworks company to carry out its contract. The case is now before the court on exceptions to the report of the master. There was a hearing in the case on an application for injunction pendente lite, the injunction granted, and the case referred to Henry R. Goetchius, Esq., standing master. 130 Fed. 180. The master made a report, and pending the consideration of the same the Supreme Court decided the case of City of Dawson v. Columbia Avenue Savings Fund, etc., Co., 197 U. S. 178, 25 Sup. Ct. 420, 49 L. Ed. 713. When that decision was announced, believing that case to be in all respects similar to the Columbus Case, on motion of counsel for the city of Columbus, this case was dismissed for want of jurisdiction. The case was taken by the complainant to the Supreme Court of the United States on the question of jurisdiction, and the action of this court was reversed. Mercantile Trust & Deposit Co. of Baltimore v. City of Columbus, 203 U. S. 311, 27 Sup. Ct. 83, 51 L. Ed. 198. The mandate from the Supreme Court having been filed in this court, the case was again argued on the exceptions to the master's

report. It has been submitted and has been for some time held under advisement by the court. The master's report is lengthy, going fully, exhaustively, and ably into the facts at issue, and into the various' legal aspects in which the case is presented. The facts necessary to an understanding of the case are briefly, but perhaps sufficiently, stated in the report of the case on application for a preliminary injunction in 130 Fed. 180.

A summary of the conclusions of fact by the master in the report now before the court, as stated by him, is as follows:

"(1) I have found that acceptance by the city was based on statement of the water company that the system had been completed in compliance with the contract and upon assurances by the company that the water would be wholesome, abundant, and lasting.

"(2) The contract outlined.

"(3) Selection of source of supply and completion of the works November 6, 1882.

"(4) I have found that the system as accepted by the city in 1882 had not met the general requirements of the contract, and that on complaints to the company the system had been improved to such an extent that in 1889 the service was at that time accepted as satisfactory to the city.

"(5) That from 1889 to May, 1900, there was dissatisfaction and complaints on the part of the city because of insufficiency of the water supply, and especially with the unsupplied needs of the city for water in its newly acquired territory; that the company had notice of this and recognized the necessity of increased water supply; that during this period the city, through its council, twice made an effort to repudiate the contract, but were not sustained by the requisite popular vote on submission of the question to the people; that the company in good faith endeavored to adjust the differences by offer to arbitrate and the city declined the offer; and that finally the city accepted the existing conditions and concluded a supplemental agreement by which the company was given an opportunity to test its ability to carry out the requirements of the contract; that the company failed in this, and that in 1902 both the council and the people determined to no longer depend upon the water company.

"(6) That the water company has at no time complied with section 3, requiring a reservoir of 125,000,000 gallons available supply, and from 1884 it has failed to comply with the requirements of section 12, as to the construction and maintenance of the reservoirs.

"(7) That paragraph 11, as to filtration, has not been complied with on the part of the company.

"(8) That the company has failed to comply with section 5 of the contract as to distribution in not connecting together the ends of its system, and placing mains sufficiently large to at all times give full supply of water.

"(9) With reference to the supply of water, I have found that the company has failed to comply with sections 1 and 10, in that sufficient supply of wholesome, constant, and ample water has not been, and cannot be, furnished from the source of supply as selected, nor is the same sufficient to meet the wants of the city and private consumers for present and future requirements.

"(10) I have found that the company has not complied with section 4 as to supply main.

"(11) That, as to pressure from 1893 to 1902, the pressure was variable and uncertain, that the gravity plan could not sustain it to the requirements of the contract, and that the standpipe and pumping devices adopted to assist it, while practically beneficial, were not at all times satisfactory; that the company has not met the requirements of section 27 in maintaining pressure at 32 pounds, nor supplemental contract requirement of 40 pounds, and that in fires of any magnitude the pressure and water supply is insufficient, and that the supply is not ample for fire protection as required by section 9, and that the receiver by the improvement of the pumping station has greatly bettered conditions.

"(12) With reference to the wholesomeness of the water as required by section 10, I have found that the reservoir water when available is, under normal conditions, a wholesome water, but when the water is low it is not wholesome; that prior to July, 1902, the water furnished by the company was, with few exceptions, within the requirements of the contract, and in these exceptions the city has not availed itself of the provisions of section 13 of the contract to correct impurities; that since July, 1902, the company has not furnished a constant supply of wholesome water, nor has the receiver been able to do so; that the Chattahoochee river cannot be relied on as a constant source of supply for wholesome water, but only so when, on a normal flow of the river, water is taken from points above all possibility of contamination and properly filtered.

"(13) I have found that the purchasers of the water company in 1890 acquired the stock of the company without consideration; that the property was acquired by the issue of $500,000 of bonds to the purchasers, three hundred and twenty-five thousand ($325,000) dollars of which was the agreed valuation of the property, and was used by themselves in its purchase; that the price was largely in excess of its actual value, and that the syndicate who originally purchased these $325,000 of bonds knew or had full opportunity of knowing this fact; that of the cash proceeds of the sale of these $325,000 being the full amount less 10 per cent. discount and added interest, the sum of $150,000 was applied to discharge an outstanding bond issue, and the purchasing company and its individual shareholders received the benefit of the remainder; that the subsequent purchasers, and who are still the present holders of these $325,000 bonds, bought the same from and upon representation of the bond syndicate.

"(14) That there are outstanding 392 bonds, of which 386 are on deposit with the bondholders' committee; that the 67 extension bonds should be placed on the same basis as the 325 bonds originally issued, and that at the time of the filing of the bill the company should be chargeable with interest on 392 bonds.

"(15) That the company has not been able, for the want of available funds to maintain and improve its system as the growth of the city demanded, and that extensions since 1891 have from time to time been, with the exception of a small amount, paid for by a necessary increase of a bonded indebtedness originally out of proportion to the earning capacity of the system, and constantly growing further beyond the ability of the system to maintain; that the system has not been reinforced and strengthened as its needs require, and that the owners of the bonds of the company recognize this fact.

"(16) That the actual amount expended by the receiver to January, 1904, on betterments is $42,220.85.

"(17) That the probable cost of proposed improvements needed to make the system adequate for the present needs of the city will be $85,000, exclusive of expenditures made by the receiver, and that such improvements and changes contemplate the river as a permanent source of supply.

"(18) That the present estimated value of the available portion of the system with the river as a source of supply is $176,562.62.

"(19) [This clause has reference to rentals and is not material here.]"

The master's summary of his conclusions of law is stated as follows:

"(1) I have concluded that the city had the power to enter into the contract, provided no state or federal law was violated.

"(2) That the contract did not create a debt in violation of the Constitution of Georgia.

"(3) [This finding is immaterial here.]

"(4) That the grant of the franchise is to be construed as meaning that the city would not enter into competition with the water company as long as the contract for supplying water to the city could be complied with on the part of the company, and that the grant was permissible as an incident to the performance of the principal undertaking.

"(5) That the act of 1902 is not a revocation of the franchise as defined in this contract.

"(6) That the city in the exercise of its police power could enact the ordinance now sought to be set aside, but with limitations as to the rights of the water company and its creditors as may be determined by the court.

"(7) That the acceptance of the works was conditional, and the company not having fulfilled its assurances of complying with the contract, and that without fault on the part of the city, the latter is not estopped from constructing a system of its own.

"(8) That the city is released of its reciprocal obligations by reason of the continued default of the company.

"(9) That the city could not in its execution of the contract in 1881 bind future administrations to purchase. The clause is to be construed as conferring a privilege of purchase and nothing more.

"(10) That the valuation of the system should be fixed at cost of reproduction and 10 per cent. added for present connections with and supply of buildings. .

"(11) That the contract with the city should be rescinded and injunction denied, and that the bondholders are not entitled to continue operating the works under the contract.

"(12) [The twelfth finding is also immaterial here.]"

As to the peculiar rights of the bondholders in this case the master, after some discussion of the matter, concludes as follows:

"I conclude:

"(1) That the holders of the bonds of the Columbus Waterworks Company have no greater legal right than the company to a continuance of the present contract, and the company having failed to perform its conditions, and the city being entitled to a cancellation thereof, as against the company, it has a similar right against the bondholders who have no legal right to a continuance of the contract for their benefit.

"(2) That the city of Columbus is entitled to have said contract rescinded and declared set aside and annulled, and that it should be permitted to carry out the purpose of the ordinance of September 14, 1902, for the construction and operation of a system of waterworks.

"(3) That the water company is not entitled to the enforcement of the specific performance of its contract, nor of the validation thereof, nor to an injunction against the city's carrying out the purposes of its ordinance."

The master then makes the following recommendations based on his findings of fact and of law:

"Reviewing the several findings of fact, and conclusions of law and fact as applicable to this case on its merits, I have to submit, in conclusion, the following:

"The case, is before the court under proceedings brought about by the trustee moving against the Columbus Waterworks Company in the interest of the holders of bonds of the company. Both the plaintiff and defendant in the foreclosure proceedings are parties to the present bill. The city, as defendant herein, is applying through a cross-bill for affirmative relief. The court is in control of and operating the property. Connected with the legal questions involved is the grave question of supplying the population of a large and growing city with wholesome and abundant water for domestic and sanitary uses, and for protection of property. 'The consideration of public interest will largely influence a court of equity when property upon which an entire city is dependent for its water comes into the power and under control of the court.' Joy et al. v. City of St. Louis, 138 U. S. 1, 11 Sup. Ct. 243, 34 L. Ed. 843. On the other hand, the bondholders, the real parties at interest as to the disposition of the property in litigation, have supplied all the funds both for the original purchase and enlargement of the works, to the extent they have been enlarged. It is true they assumed the risk of the investment, and their legal rights are no higher than those of the water company, but there may be an equity in their favor. There were portions of the system lying within the city of Columbus which could possibly be made available for the future uses of the city from whatever source her water supply is drawn.

While the city is entitled to a rescission of the contract and may proceed to construct her own water system, such a system operated independent of that of the water company would without doubt greatly destroy, if not render entirely valueless, the property to which these bondholders now look for the security of their bonds. Would it not be in accordance with equity and good conscience to require the city, in view of all the facts developed in this case, to utilize this available portion of the system at its reasonable and fair value and the proceeds be appropriated for the benefit of the holders of the bonds? The court, having jurisdiction, and having power to do, under the present bill, whatever may be necessary or proper to fully protect the rights of all and do equity between the parties, can mould a decree which will work no injustice. Whatever be the value of the present waterworks property, any portion of it which can be of use to the city in the construction and operation of future waterworks should be made available for that purpose, and the net proceeds thereof should in equity be applied for relief to that extent of the holders of bonds of the water company. It would be manifestly unjust and inequitable to allow the city to proceed unconditionally with its plan to provide the inhabitants with water, and not protect the interests of these bondholders to the extent, at least, of the value of such portions of the system as may be available for the city's use. To quote the language of one of the able counsel for the complainant: 'They [the bondholders] are entitled to be protected to the extent of the value that is there.' While he referred to the value of the entire system, the statement is equally applicable to the portion which may be available for the city's uses. The bondholders have proposed to sell the present system to the city at a fair valuation. The city contracted for the privilege of purchasing the system, and, while I have found this not to be a binding legal obligation of purchase, it may in equity be enforced to the extent of requiring a purchase of such parts of the system as the city may now use. I have found that the portions lying in the state of Alabama are of no practical value. The valuation I have found is applicable only in case the river is to be used as a source of supply, and I have found that this was not in the minds of the parties when the contract was entered into.

"A decree in this cause refusing injunction and declaring the contract annulled and canceled should not be unconditional. The available property need not be necessarily lost to the bondholders, if they be willing to save it upon the terms decreed by the court. They could be permitted to accept from the city a fair valuation thereof and the city could be required to pay the same before proceeding to carry out the purposes of its ordinance. If, on the opportunity being afforded, the complainant, trustee for the bondholders, declines to accept the valuation fixed by the court and convey to the city the available part of the system, then the city should be permitted unconditionally to proceed with its undertaking.

"I therefore recommend:

"(1) That in order to ascertain what may be the value of the portion of the system located in the state of Georgia, so far as the same can be utilized by the city to supply such a distribution system as would be adequate for the needs and purposes of the city in the construction and operation of a waterworks system, a special reference be had to take testimony of experts upon this question, and that a report be had thereon.

"(2) That, on such report being made, the city be required, in terms of a conditional decree, to pay into court for the use of the trustee complainant in this cause (subject to prior payments as may be decreed), the sum ascertained by said report, said payment to be made within a day specified after the filing of written consent on the part of the trustee for the bondholders to accept said amount in satisfaction of all interest and claim of right which said bondholders allege as existing under the outstanding bonds of the company or otherwise.

"(3) That thereupon the lien attaching by virtue of the trust deed or otherwise held by the complainant to secure the bonds of the water company, so far as the same applies to the property of the company within the corporate limits of the city of Columbus, Muscogee county, state of Georgia, and found under said reference to be of use to the city, be released and canceled, and that the Columbus Waterworks Company and the Mercantile Trust & Deposit

Company of Baltimore execute and deliver to the city of Columbus a conveyance of all said property, free from all liens and incumbrances under said trust deed and mortgage, and that the trustee be required to so enter upon said deed. and upon the several bonds on deposit with it and those held for the committee of bondholders in this cause, and that the holders of such bonds as have not been so deposited or held shall be estopped from setting up any claim or lien upon the property so conveyed, and, further, that the eight bonds held by the receiver be surrendered and canceled, and receiver's certificates be substituted therefor as collateral for the outstanding indebtedness secured by said bonds.

"(4) That out of the funds decreed to be paid into court there shall first be paid any sums necessary for redemption of all outstanding certificates of the receiver, and such other sums as may be proper to be paid after an accounting has been had of the indebtedness of the receiver, and that the property above named be declared free of all lien of receiver's certificates and all other liens.

"(5) That the affirmative relief as prayed in the cross-bill of the city be granted, and that the city be allowed, after the deposit of the aforesaid amount, to proceed to carry out the purposes of the ordinance providing for its waterworks system.

"(6) [The sixth recommendation is immaterial here.]

"(7) That the cost of the litigation be taxed equally between the parties.

"(8) That in the event the city fail to pay in the amount on the day specified as provided in the second paragraph herein, when written acceptance is filed by the trustee as required, then injunction issue against the city, and the bondholders be permitted to carry out the contract as prayed in their amendment to the bill, and all costs be taxed against the city; but in the event the acceptance of the trustee is not filed, as required, then the bill of complainant be dismissed, and the city permitted to proceed to carry out the purposes of its ordinance of September, 1902, and all costs be taxed against the complainant."

The principal legal questions controlling in this case are: (1) Whether the city under its charter had the authority to contract for a supply of water for the city and its inhabitants; (2) whether the contract in this case created a debt in violation of the Constitution of the state of Georgia; and (3) whether the exclusive character of the contract in this case can be upheld.

It is well settled in Georgia, as held by the master, and as determined by Circuit Judge Pardee in the case of City of Dawson v. Columbia Avenue, etc., Trust Co., supra, that cities have the power under the "general welfare" clause in their charters to enter into contracts for a water supply for their inhabitants for domestic use and for fire protection. Mayor and Council of Rome v. Cabot, 28 Ga. 50; Wells v. Mayor and Council of Atlanta, 43 Ga. 67; Grace v. Hawkinsville, 101 Ga. 553, 28 S. E. 1021. That the action of the city council of Columbus in entering into this contract did not create a debt in violation of the Constitution of the state is also held by the master in this case, following the decision in the Dawson Case. After quoting from the report of the special master, approved by Judge Pardee, in the Dawson Case. it was said in this case on the former hearing (130 Fed. 184):

"From these citations it will be seen that the decisions of the Supreme Court of the state were quite as favorable to the validity of the contract in this case as they were at the time of the contract in the Dawson Case. If in that respect there is any distinction in the two cases, it is favorable to the complainant here."

The views of the court in the Dawson Case, and in this case when the former decision was made, are well expressed by the master in the Dawson Case, in this language (130 Fed. 171):

"It cannot, therefore, fairly be said that there was such a settled course of judicial decisions in Georgia on this question at the time of the making of the contract as to constrain the courts of the United States to follow later decisions of the state court, especially in a case where the rights of innocent third parties are concerned."

The decisions of the Supreme Court of the state of recent years have been to the contrary, but this could not affect the contract if, at the time it was made, the decisions of the Supreme Court were as stated. I see no reason for departing from what was held in the Dawson Case, and what was before held in this case as to this question.

The next, and perhaps most important, legal question involved in this case is that of the exclusive character of the contract. When this case was before the court on the application for injunction pendente lite, the Walla Walla Case, 172 U. S. 1, 19 Sup. Ct. 77, 43 L. Ed. 341, was the most important and controlling case on the subject of the exclusive character of such contracts as this. Since that time a number of decisions have been made. The three most recent cases are Knoxville Water Co. v. City of Knoxville, 200 U. S. 22, 26 Sup. Ct. 224, 50 L. Ed. 353, City of Vicksburg v. Vicksburg Waterworks Co., 202 U. S. 453, 26 Sup. Ct. 660, 50 L. Ed. 1102, and the quite recent case of Water, Light & Gas Company of Hutchinson v. City of Hutchinson, 207 U. S. 385, 28 Sup. Ct. 135, 52 L. Ed. ——. These three cases cite quite a number of preceding cases, none of which need be discussed here in the view that is taken of the question as determined by the facts of this case, and of the contract under consideration. In the Knoxville Case it is held by a majority of the Supreme Court (four justices dissenting) that an agreement on the part of a city with a waterworks company not to enter into a contract with any other parties for the establishment of waterworks during the period of the contract did not prevent the city itself from erecting waterworks. In the Vicksburg Case it was held that the exclusive character of the contract entered into in that case prevented the city from entering into competition with the waterworks company by the erection of waterworks of its own. In the Hutchinson Case the decision seems to have been based on local statutes and decisions of Kansas, and it was determined by the Supreme Court that, under those statutes and decisions, the city of Hutchinson was not authorized to enter into an exclusive contract. The case here is more nearly like the Vicksburg Case. Assuming, as I have, that the city had authority, under the general welfare clause in its charter, to enter into this contract, and that it did not, as the decisions stood at the time the contract was made, create a debt in violation of the Constitution of the state, there is nothing, so far as I have been able to see, and certainly nothing has been brought to the attention of the court, under the statutes and decisions of this state which would prevent the city of Columbus from making an exclusive contract for a limited period, if that contract was a necessary and indispensable incident to the contract for a supply of water. That such a grant of an exclusive privilege was necessary and indispensable to the main undertaking of the city seems to me to be beyond question. Considering the size of the city of Columbus at the time this contract was entered into, and the number of

its inhabitants, it would have been an impossibility to have had any one enter into a contract of this sort, if the parties so contracting were to be met immediately, or soon thereafter, with competition from another waterworks company, or from the city itself engaging in the business of supplying water to the city and its inhabitants. Such a contract would have been utterly valueless, and no one would have undertaken the expenditure necessary for the establishment of such a system of waterworks as was contemplated by this contract, and was actually established, unless they had been guaranteed an exclusive right for some reasonable period at least for rendering the service and receiving the return expressed in the contract.  Competition from other parties, or from the city, would, of course, have destroyed the entire value of the outlay.  It is clear that responsible parties would not have entered into any such contract except for its exclusive character.  This being true, it comes within the decision in the Vicksburg Case, 202 U. S. 453, 26 Sup. Ct. 660, 50 L. Ed. 1102. The language of the court in that case, in the opinion by Mr. Justice Day, is so pertinent here that I quote from it at some length, as follows:

"The contract in the respect under consideration is found in section 1 of the ordinance, and undertakes to give to Bullock & Co., their associates, successors, and assigns, the exclusive right and privilege, for the period of 30 years, from the time the ordinance takes effect, of erecting, maintaining, and operating a system of waterworks, with certain privileges named, for the furnishing of a supply of good water to the city of Vicksburg and its inhabitants for public and private use.

"Without resorting to implication or inserting anything by way of intendment into this contract it undertakes to give by its terms to Bullock & Co., their associates, successors, and assigns the exclusive right to erect, maintain and operate waterworks, for a definite term, to supply water for public and private use.  These are the words of the contract, and the question upon this branch of the case is, conceding the power of the city to exclude itself from competition with the grantee of these privileges during the period named: Has it done so by the express terms used?  It has contracted with the company in language which is unmistakable that the rights and privileges named and granted shall be exclusive.  Consistently with this grant, can the city submit the grantee to what may be the ruinous competition of a system of waterworks to be owned and managed by the city, to supply the needs, public and private, covered in the grant of privileges to the grantee?  It needs no argument to demonstrate, as was pointed out in the Walla Walla Case, that the competition of the city may be far more destructive than that of a private company.  The city may conduct the business without regard to the profit to be gained, as it may resort to public taxation to make up for losses.  A private company would be compelled to meet the grantee upon different terms, and would not likely conduct the business unless it could be made profitable. We cannot conceive how the right can be exclusive, and the city have the right at the same time to erect and maintain a system of waterworks, which may and probably would practically destroy the value of rights and privileges conferred in its grant.  If the right is to be exclusive, as the city has contracted that it shall be, it cannot at the same time be shared with another, particularly so when such division of occupation is against the will of the one entitled to exercise the rights alone.  It is difficult to conceive of words more apt to express the purpose that the company shall have the undivided occupancy of the field so far as the other contracting party is concerned.

"The term 'exclusive' is so plain that little additional light can be gained by resort to the lexicons.  If we turn to the Century Dictionary, we find it defined to mean: 'Appertaining to the subject alone; not including, admitting or pertaining to any other or others; undivided; sole; as, an exclusive

right or privilege; exclusive jurisdiction.' We think, therefore, it requires no resort to implication or intendment in order to give a construction to this phase of the contract; but, on the other hand, the city has provided and the company has accepted a grant which says in plain and apt words that it shall have an exclusive right, a sole and undivided privilege. To hold otherwise in our view would do violence to the plain words of the contract, and permit one of the contracting parties to destroy and defeat the enjoyment of a right which has been granted in plain and unmistakable terms. On the authority of the Walla Walla Case, the city had the power to exclude itself for the term of its contract, giving the words used only the weight to which they are entitled, without strained or unusual construction, and we think it was distinctly agreed that, for the term named, the right of furnishing water to the inhabitants of Vicksburg under the terms of the ordinance was vested solely in the grantee, so far at least as the city's right to compete is concerned. Any other construction seems to us to ignore the language employed and to permit one of the parties to the contract to destroy its benefit to the other. We think the court below did not err in reaching this conclusion."

The above language appears to be conclusive of the question before the court in this case. The contract in that case was exclusive, and in this case it is exclusive. It was for 30 years, in both cases. I do not see either any material difference between the local law in Mississippi and the law in Georgia at the time the Columbus contract was entered into. My conclusion, therefore, is that the exclusive feature of this contract must be upheld.

It may be proper, however, in this connection to consider the effect of certain provisions of the Constitution of Georgia which were relied upon by counsel for the city. Article 1, § 3, par. 2, Const. Ga. 1877, provides that:

"No bill of attainder, ex post facto law, retroactive law, or law impairing the obligation of contracts, or making irrevocable grants of special privileges or immunities, shall be passed."

The succeeding paragraph (3) provides:

"No grant of special privileges or immunities shall be revoked, except in such manner as to work no injustice to the corporators or creditors of the incorporation."

The provision of the Constitution of the state of Mississippi is as follows:

"Corporations shall be formed under general laws only. The Legislature shall have power to alter, amend or repeal any charter of incorporation now existing and revocable, and any that may hereafter be created, whenever in its opinion, it may be for the public interest to do so; provided, however, that no injustice shall be done to the stockholders."

The Supreme Court, in the opinion in the Vicksburg Case, 202 U. S. 464, 465, 26 Sup. Ct. 660, 664, 50 L. Ed. 1102, after referring to the fact that the Constitution in which this provision occurred was adopted in 1890, and the contract in that case was created by an ordinance which was passed in 1886, refers to the case of Hamilton Gaslight & Coke Co. v. City of Hamilton, 146 U. S. 258, 13 Sup. Ct. 90, 36 L. Ed. 963, and proceeds in this language:

"Furthermore, the Mississippi Constitution contains this provision which is not in the Ohio Constitution considered in the Hamilton Case namely: 'Provided (in exercising the right of amendment or repeal of a charter) no injustice shall be done to the stockholders.' If it be true that the complainant

below had a binding contract excluding competition by the city in furnishing a water supply for the period of thirty years, we think it would be a palpable injustice to the stockholders to permit the competition of the city by new works of its own, which, whether operated profitably for the municipality or not, might be destructive of all successful operation in furnishing water to consumers by the private company."

I think this citation of authority alone sufficient without referring to other cases in which similar clauses in state Constitutions are discussed. The effect of the action of the city of Columbus on the creditors and bondholders of the waterworks company will be hereinafter referred to. The master discusses the question raised by counsel for the city as to the right of the city, in the exercise of its police power, to provide for another supply of water. He concludes that the city has such right, subject to certain rights of the water company and its creditors, which he discusses later.

Assuming, therefore, that this is a valid contract, binding upon the city, and that the city was precluded thereby from entering into competition with the waterworks company by erecting a system of its own, we come now to the question of whether or not the waterworks company on its part has complied with its contract. I do not agree with the master entirely as to some of his findings in this respect. It seems to me, under the facts as shown by the evidence, that when the city council was informed that the waterworks system had been completed, and the council with the aid of experts examined the system and expressed its satisfaction and approval, it could not afterwards set up defects in the original construction of the system; so that as to the sufficiency of the reservoir, mains, filters, etc., I should be disposed to disagree with the master, but, as to the master's finding that there was a failure to furnish an abundant supply of pure and wholesome water, the facts in evidence before him justified his finding, particularly as to September, 1902. While there were some failures before that to give the city and the people all they ought to have had in this respect, these failures were passed over by the city, and, as a rule, the trouble was remedied, and the satisfaction of the city council expressed in the changes and improvements made. The people of the city twice refused during the contract, in 1894 and in 1897, to vote by the necessary two-thirds majority in favor of the issuance of bonds by the city for the erection of a waterworks system of its own. Although there had been complaints from the time of the completion of the waterworks in 1882 until 1889, the master found that in 1889 the system had been improved to such an extent that it was accepted as satisfactory to the city. For several years there were negotiations between the city and the waterworks company with reference to supplying water to additional territory which had been taken into the city, and these negotiations appear to have resulted in a practical agreement in 1900, although there were some few items of disagreement. The master's finding as to the condition from 1889 to 1900 is expressed as follows:

"I find that from 1889 to May, 1900, except at comparatively short intervals there was dissatisfaction and complaints on the part of the city because of the insufficiency of the water supply, and especially with the unsupplied needs of the city for water in its annexed territory; that the company had

notice of this, and recognized the necessity of increased supply. I further find that during this period the differences between the company and the city led to an effort by the council on two separate occasions to repudiate the contract, but that it was not sustained by the requisite popular vote, thereby indicating the desire of the people to give to the company an opportunity to carry out the terms of the contract; that the company in apparent good faith endeavored to adjust the differences by offer to arbitrate and the council declined, and that finally the council accepted existing conditions, and concluded a supplemental agreement by which the company was given an opportunity to test its ability to fully meet the requirements of the contract, and that in 1902 both the council and the people determined to no longer depend upon the' water company."

The source of supply of water selected by White, and accepted as has been stated, by the city, was in Alabama, four miles west of Columbus. A reservoir was first constructed · of stone, and afterwards, in 1885, a second or upper reservoir, immediately above the lower and first reservoir, was constructed by building a dam across the upper end of the first reservoir. The real difficulty, as gathered from the evidence, seems to have been the inadequacy of the supply, and also the failure on the part of the company to construct the upper reservoir as it should have been. The master finds that when the stream supplying these reservoirs became abnormally low, and the upper and lower reservoirs not properly supplied, that the water became stagnant and impure, and greatly limited in quantity. He finds that this condition existed in 1894, 1895, 1898, and 1899, and notedly so in 1902. The serious condition which existed in 1902 led unquestionably to the action of the people of the city in voting almost unanimously in favor of the issuance of bonds, which is in controversy here. Of course, one of the conditions, and perhaps the main condition, which caused the trouble in 1902, was an unusual drought. This condition really existed again in 1904 for a short time, and would have been serious perhaps but for the prompt action of the receiver, under the authority of the court, in remedying the difficulty by arranging to obtain water from the Chattahoochee river at a point above contamination.

There may be some merit in the claim made by counsel for the complainant that the action of the city council and of the people interfered to some extent with the ability of the waterworks company to carry out its contract. This, if true, was mainly so as to the agitation in the city council and among the citizens on the subject of municipal ownership, thereby affecting the credit of the waterworks company and its ability to make further improvements. But, even making some allowance for this, in my judgment the facts in evidence were sufficient to justify the master in finding that there was a failure on the part of the company to furnish an abundant supply of pure and wholesome water as provided in the contract, and finding the company at fault in this respect. It is a serious matter to undertake to supply the inhabitants of a city with an ample supply of good and wholesome water, and persons entering into a contract to do this necessarily must do so with an understanding of the important character of the undertaking. This is particularly true of a growing city. Taking this whole record together, and considering all the evi-

dence, the master, as has been stated, was justified in reaching the conclusion that there was a failure to comply with the contract in this respect.

The prayer of the cross-bill filed by the city is that it have a decree annulling the contract with the waterworks company, and that the cross-defendants be perpetually enjoined from setting up any right or interest thereunder. This would be in effect decreeing a forfeiture of the waterworks company's rights under its charter and under the ordinances of the city and under its contract. This will not be done in a court of equity, and certainly not except upon the same conditions that the prayer of the complainants in the original bill for an injunction will be denied. It should not be done unconditionally in any event, and clearly not as against the bondholders. Substantially and practically the action of the court in either finally granting or denying the injunction will settle the rights of the parties in this case, so that a decree upon the cross-bill is really unnecessary, even if it is allowable.

I come now to the consideration of the recommendation of the master as to the conditions upon which a final decree denying the injunction sought by the complainant should be entered. As shown by the record in this case, on December 22, 1902, a bill was filed by the Mercantile Trust & Deposit Company of Baltimore, trustee for the bondholders, against the company. William S. Green was appointed receiver, and permission was granted the receiver to issue $50,000 of receiver's certificates, the trustee for the bondholders consenting thereto, for the purpose of making improvements to the waterworks plant. The receiver assumed charge on January 15, 1903. At the time the report of the master was filed the receiver had expended $47,220.85 in improvement of the plant, the larger part of which was for a filter plant and pumping station. Since that time the receiver has expended a considerable additional amount in improvements. From the time he took charge the receiver has, with one exception, been furnishing the city with fairly good water, and with a sufficient supply of the same. The exception was in the summer of 1904, during a protracted drought, when the streams in Alabama were almost dried up, and the Chattahoochee river very low. The main difficulty was that the intake was at a point below where there was some contamination of the river. This was promptly remedied, and, since that time there has been no complaint, at least none has been brought to the attention of the court. The bondholders, acting through their committee, have done everything reasonably within their power to make the present waterworks system effective and satisfactory. I am not satisfied that under the facts of this case it is brought within the ruling of the Supreme Court in Farmers' Loan & Trust Co. v. City of Galesburg, 133 U. S. 156, 10 Sup. Ct. 316, 33 L. Ed. 573. In that case it was held that the rights of the bondholders were no higher than those of the company; the decision being based, of course, on the facts of that case. In this case the city has for five years accepted and received the benefit of the efforts of the bondholders to give the city a good supply of water. While, of course, the bondholders were interested in protecting their security,

the result of the work and improvements for which they furnished the funds has been to give the city what is conceded I think by all parties to be at least a fairly good supply and quality of water. They must continue to do this until the end of this litigation, whenever that may be, for the idea could never be entertained of allowing the waterworks to be stopped and the city left practically without water, as it would be now unless this system was continued. The maxim, "He who. seeks equity must do equity," is applicable here. . I conclude that not only in justice and fairness, but testing the matter by sound principles of equity, the city, as against these bondholders, should be required to take so much of this waterworks plant as may be hereafter determined, at a fair valuation, as a condition of, and before a decree is entered in its favor finally denying an injunction in the case against the issuance by the city of its waterworks bonds.

The master finds that the present estimated value of the available portion of the system, with the river as a source of supply, is $176,-562.62. This does not include the value of that portion of the company's property in Alabama, including its lands, reservoirs, pipes, and right of way in Alabama. It seems to me that it would be impracticable to detach this portion of the system from the other, in the manner suggested by the master. The Alabama property must be in any view of it of considerable value, and for some time to come, allowing for any direction this case may take, it should and doubtless will be used as a partial source of supply. There is a provision in the contract that:

"At the end of fifteen years from the completion of the works the city shall have the right to purchase the same with all the rights, franchises, and property at a price to be mutually agreed upon, or the valuation may be ascertained by three disinterested nonresidents of Columbus or Muscogee county, one to be a hydraulic engineer, the city to appoint one arbitrator, White one, and these two to select a third. When the value of the works is thus ascertained and declared, the city shall pay the sum named with ten (10) per cent. added; and the city shall, in this purchase, assume all the obligations of White, the lawful acquittances of which shall be received by White as a part of the cash payment of the declared value of the waterworks. The obligations include such as are for operating, maintaining, and extending the same, and the duties incident thereto. In assuming money obligations for indebtedness, or choses in action, due from White to others, the same shall be in lieu of cash payments to equal amounts, and no obligation to assume money liabilities greater than the value to be paid by the city; but the city has the right to decline the purchase after the value is ascertained upon payment of expenses of arbitration. If the city does not buy on this valuation when ascertained the right and privileges of White shall continue in force until the final purchase of the works by the city. The right to purchase shall inure to the city every 15 years, but in every case White is to have 12 months previous notice of the city's intention to purchase."

In my opinion this provision of the contract adds to the duty of the city to take this waterworks plant at a fair valuation, as it was clearly in the minds of the parties, the city, and White, the assignor of the Columbus Waterworks Company, that, if the city should desire to establish municipal ownership, it might take this plant at a fair valuation. It adds something at least to my mind to the equities of the bondholders in the present situation. I can understand and

appreciate fully the desire of the authorities and of all the people of Columbus for an adequate supply of good water. Nothing is more necessary to the welfare and comfort of the people. They are entitled to this, and should have it. But there is no reason whatever why the present waterworks plant, or certainly the greater part of it, cannot be utilized in connection with any new source of supply that may be resorted to by the city. I agree substantially with the recommendation of the master stated above as to the terms upon which a decree denying an injunction should be entered, except that I think it should be conditioned upon paying the fair value of such property of the company; that is, the whole or a part as the court may decree, after ascertaining in proper manner the value now of the property in Georgia, and the value of the entire property with that in Alabama added. Considerable additions and a number of improvements have been made to the property in Columbus since the master's report. The city should have the option, however, of having the value of the property submitted to arbitration, as provided in the contract, in case it should elect to do so. This arbitration should fix the value in the manner just mentioned; that is, the value of the property in Georgia, and the value with the property in Alabama added, so that both valuations will be before the court.

Before a final decree is entered in this case, a reasonable time should be given the city authorities to consider the matter and determine what action they think it advisable to take. This litigation has already been greatly protracted, and probably 60 days' time for this purpose will not be unreasonable, and no final decree will be entered for that time.